**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

DANIEL GUFFEY,

                          Petitioner,

        vs.

RICHARD SUBIA, Warden, et al.,

                        Respondents.

Civil No.    07cv1620-IEG (CAB)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS**

      This Report and Recommendation is submitted to Chief United States District Judge Irma E. Gonzalez pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**I.**

**FEDERAL PROCEEDINGS**

      Daniel Guffey (hereinafter "Petitioner"), is a state prisoner proceeding pro se with a Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner challenges his San Diego County Superior Court convictions for second degree murder and conspiracy to commit assault, claiming that his federal constitutional rights were violated because: (1) there was insufficient evidence to support the murder conviction; (2) the failure to sever his trial from his co-defendants violated due process; and (3) the admission

1   of a co-defendant's extrajudicial statement violated Petitioner's right to confront and cross-

2   examine witnesses.  (Pet. at 6-9.)

3        Respondent has filed an Answer to the Petition with an incorporated Memorandum of

4   Points and Authorities in support thereof, and has lodged portions of the state court record.

5   (Doc. No. 25.)  Respondent contends that habeas relief is unavailable because the state court's

6   adjudication of Petitioner's claims involved an objectively reasonable application of clearly

7   established federal law.  (Memorandum of Points and Authorities in Support of Answer ["Ans.

8   Mem."] at 16-23.)  Petitioner has filed a Traverse with an attached Notice of Lodgment.  (Doc.

9   No. 29.)

10                                               **II.**

11                                   **STATE PROCEEDINGS**

12        In a two-count Second Amended Information filed in the San Diego County Superior

13   Court on April 18, 2003, Petitioner and his two co-defendants, Jesse Lyle Gehrke and

14   Christopher Smith, were charged with conspiracy to commit assault in violation of Cal. Penal

15   Code section 182(a)(1), and murder in violation of Cal. Penal Code section 187(a).  (Lodgment

16   No. 2, Clerk's Transcript ["CT"] at 26-28.)  It was also alleged that Gehrke and Smith personally

17   used a knife during the commission of the murder.  (CT 27-28.)

18        On May 23, 2003, a jury found Petitioner guilty of second degree murder and conspiracy

19   to commit assault.  (CT 527-28.)  The same jury found co-defendants Gehrke and Smith guilty

20   of first degree murder and conspiracy to commit assault, and returned true findings that they

21   personally used a knife during the commission of the offenses.  (CT 330-31, 621-22.)  On

22   September 18, 2003, Petitioner was sentenced to a state prison term of 15 years-to-life.  (CT

23   564.)  Gehrke was sentenced to 57 years-to-life and Smith to 27 years-to-life.  (CT 421, 650.)

24        Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate

25   District, Division One, raising, *inter alia*, all claims presented in his federal habeas Petition here.

26   (Lodgment Nos. 9-10.)  The appellate court consolidated Petitioner's appeal with that of his two

27   co-defendants, and affirmed the convictions in an unpublished opinion.  (Lodgment No. 6,

28   People v. Gehrke, et al., D042984, slip op. (Cal.Ct.App. Jan. 31, 2006).)  Petitioner thereafter

filed a petition for review in the state supreme court raising the claims presented here. (Supplemental Lodgment No. 8.)  That petition was consolidated with the petitions for review filed by Petitioner's co-defendants, and denied by an order which stated in full: "Petitions for review DENIED."  (Lodgment No. 8.)

## II.

## UNDERLYING FACTS

The following statement of facts is taken from the appellate court opinion affirming Petitioner's conviction on direct review.  This Court gives deference to state court findings of fact and presumes them to be correct.  See Sumner v. Mata, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to factual findings of both state trial and appellate courts).

> Guffey had a romantic relationship with Kathleen Dockler over a period of years and, in the summer and fall of 2001, he lived with her in her trailer home in De Anza Cove.  (All relevant dates are in 2001 except as otherwise noted.)  In the fall, the relationship between Guffey and Dockler deteriorated and in December Dockler ended the relationship, telling Guffey to move out.  Guffey was very upset about the breakup and begged Dockler to give him another chance.  Dockler declined and, shortly thereafter, she began an intimate relationship with Rawson, a close friend of Guffey's who Guffey had introduced to her in November.  Guffey began stalking Dockler, showing up at places where she was, going to her home uninvited, calling her repeatedly at her home and on her cell phone and sending her e-mails.

> On December 24, Guffey's family saw Dockler and Rawson while they were out to dinner.  The next day, Guffey went to Dockler's trailer home and waited inside until Dockler came home, at which time he confronted her about her relationship with Rawson and threatened to kill Rawson and his family.  Guffey also told Dockler's friend, Linda Drake, that he was going to "take (Rawson) out" and that Rawson was not "going to be a problem anymore."  Thereafter, Guffey continued to make frequent calls to Dockler, seeking to resume their relationship.  Dockler and Rawson became nervous about Guffey and began hiding out at Rawson's parents' house in La Mesa.

> On approximately December 29, Guffey went to the hotel room where his friend, Bruce Phifer, was living; Guffey was upset about Dockler and asked Phifer to beat Rawson up.  Phifer declined, saying that he did not want to get involved but that he would mention it to Gehrke, who worked for his drywall business and frequently stayed with him.  Although Gehrke was in the room at the time, he did not participate in the conversation; when Guffey left, however, Gehrke followed him.

> On December 30, Guffey broke into the Rawsons' home and tried to start a fight with Rawson.  Guffey screamed at Rawson, claiming that Rawson was withholding something from Dockler.  After Rawson failed to respond to Guffey's provocation, Guffey grabbed the television remote control from Rawson's hand and threw it against the wall, breaking it into pieces.  Guffey threatened to kill

Rawson, left and placed a note on Dockler's car that said "I told you the truth." Dockler and Rawson reported the incident to the La Mesa Police Department.

After leaving the Rawsons' house, Guffey went with Gehrke and Phifer to Dockler's trailer. While Dockler and Rawson were waiting for the La Mesa police to arrive at the Rawsons' house, Guffey called and left a message indicating that he had just been inside the trailer. Guffey also made repeated calls to Dockler's cell phone until one of the La Mesa police officers talked to Guffey and told him to stop. Dockler and Rawson gave their report and then went to the trailer to meet with San Diego police about the break in; Dockler discovered that some of her things, including a computer, were gone. As a result of these incidents, Dockler and Rawson decided that they needed to get a restraining order against Guffey.

The next day, Guffey called Phifer, looking for Gehrke; Phifer wrote down Guffey's phone number and gave it to Gehrke. Thereafter, Phifer did not see Gehrke, either at work or his motel room, for four or five days.

In the early morning hours of January 1, 2002, Guffey e-mailed Dockler a love poem that said in part "by the time that you read this, it will have all come undone." That night, Guffey drove to the Rawsons' neighborhood several times to look for Dockler's car. During the drive, Guffey told a friend, Amber Stanley, that he felt Rawson had betrayed him and asked whether she knew anyone who would help set Rawson up to be the victim of a hit-and-run. Close family friend Jeremiah Beamer later joined Guffey and Stanley for part of the morning; he thought Guffey appeared angry and that his demeanor was "weird." At approximately 4 a.m. on January 2, 2002, Guffey called Phifer, upset and saying that something bad had happened.

Meanwhile, on the evening of January 1, 2002, Gehrke and Smith (who also did work for Phifer's business) talked to Kyla Stark, a homeless woman who knew Smith; they told her that they were going to a house in La Mesa to collect "quite a bit" of money from a man and offered to pay her if she would knock on the door and help them get inside. The three walked from El Cajon to La Mesa; they got lost several times and arrived in La Mesa sometime before 9 a.m. the next morning.

That same morning, Dockler dropped Rawson off at his parents' home and went to work, with plans to return later in the morning so that they could go get a restraining order. At approximately 8:15 a .m., Rawson called the La Mesa police detective to whom he had spoken about the December 30 incident and left a message. An hour or so later, a neighbor of the Rawsons noticed two men and a woman who looked out of place walking in the neighborhood.

Later in the morning, Stark, Gehrke and Smith went to the Rawsons' house and knocked on the door; Rawson, who was alone in the house, recognized Gehrke and invited them all to come inside. In the same time frame (sometime between 11 and 11:15 a.m.), a woman who was working nearby saw Guffey's van, which was distinctive because it had the logo and phone number of his locksmith business on the side, driving very slowly down the street in front of the Rawsons' house.

Once inside the house, Gehrke and Smith sat and talked with Rawson for a half hour or so, while Stark wandered around the house, looking at the Christmas decorations and Mrs. Rawson's dollhouse. During this time, Gehrke used Rawson's phone to call Guffey's cell phone. After hanging up, Gehrke

indicated to the group that Rawson's girlfriend was coming over in 20 minutes to bring some money. Sometime between 11:15 a.m. and 11:30 a.m., Dockler called the Rawsons' house to tell Rawson she was running late; a female answered the phone and Dockler asked to speak to Rawson. The woman passed the phone to Smith and, although Dockler did not recognize his voice, she told him that she was on her way.

Stark went to the kitchen to get some cookies to eat and heard Smith say "stay down" several times. She went back to the living room and saw Gehrke and Smith stabbing Rawson repeatedly and trying to keep him down on the floor as he fought to escape out the front door. Stark was scared and tried to leave, but Smith grabbed the back of her shirt, telling her to sit down and shut up or she would be next. As Rawson struggled with the two men, Smith grabbed him and slit his throat; Rawson fell near the front door, blocking it.

There was "blood everywhere," which made Stark nauseous, and she ran to the bathroom and got sick. By the time she came out of the bathroom, Gehrke and Smith had left the house, jumped the fence and were running down the street. Stark yelled at the men to wait because she did not know how to get back to El Cajon, but they kept running, taking off their shirts as they did so.

In the meantime, after leaving the Rawsons' neighborhood, Guffey drove to Mission Valley to pick up Amber Stanley. While he was in the parking lot of the hotel where Stanley was staying, he received Gehrke's call from the Rawson's home phone. Stanley noticed that Guffey was wearing the same clothes as he had on the prior night, but was "really agitated" and appeared to have injuries on his hands. Guffey told Stanley that he had slapped Rawson around and "got(ten) (Rawson) good"; Guffey was prone to bragging, so Stanley did not believe him, but she was frightened by his behavior.

Shortly after noon, Gehrke and Smith showed up unexpectedly at the El Cajon home of Robert Bunch, an acquaintance of Smith's; they were sweating and asked if they could come in to clean themselves up. The men stayed for about 30 minutes, during which time they washed their hands in the kitchen and Smith used Bunch's cell phone to call Guffey.

Dockler arrived at the Rawsons' house at about noon, but was unable to get inside. After a period of time, Rawson's parents came home and with Dockler, discovered Rawson's body; he had been stabbed multiple times and his neck had been slit. The coroner concluded that Rawson had been dead for at least a couple of hours by the time his parents found him. Police arrested Guffey that evening; Guffey called Beamer from jail and told him to not say anything to the police about their drive in the Rawsons' neighborhood the prior morning because doing so could affect Beamer's military career.

The next morning, Stark bumped into Smith in an alley in El Cajon and expressed dismay about what had happened. Smith responded that she needed to get out of town and to keep her mouth shut. That evening, Stark was still upset; she got drunk and told Joseph Brown, a former boyfriend, that she had helped two men get inside the house of a man who owed a drug dealer a large sum of money and that, once inside, the men stabbed the occupant. Stark decided to go into hiding.

Two days after the murder, Gehrke and Smith showed up at Phifer's motel room, saying that they needed to leave town. Gehrke told Phifer that a woman helped them get into the Rawsons' house; Smith said that they had "offed"

07cv1620

Rawson and that he had driven home his "Old Timer," a brand of pocketknife that he owned. Phifer's fiancée, Kathleen Wheaton, became very upset and told Phifer to get the men out of there, so Phifer drove Gehrke and Smith back to El Cajon. Phifer subsequently learned that the police were looking for him, so he stopped going to the motel room and to work for awhile.

On January 20, 2002, Smith bragged to a friend that he had slit someone's throat. Shortly thereafter, the police arrested Gehrke and Smith for parole violations, but did not charge them with the murder. The officers found Guffey's cell phone number written on a scrap of paper in Gehrke's wallet.

On January 23, 2002, police located Phifer at a party; Phifer voluntarily left with the officers and agreed to a taped interview. During the interview, Phifer was asked whether he was afraid of Gehrke and, after he responded that he was, one of the detectives commented that Phifer "kn(e)w Gehrke history." Phifer told the detectives about his conversations with Guffey before the murder and that Smith and Gehrke had confessed to killing Rawson several days afterward.

Based on a tip, police located Stark in early February 2002 and arrested her. Stark originally claimed that she did not know anything about the stabbing or the murder, but after the officers told her they knew of her involvement, showed her pictures of Gehrke and Smith and told her the men were in jail, she told them about what had happened. Although Stark was originally charged with murder, she ultimately pleaded guilty to being an accessory after the fact to the murder.

In June 2002, Guffey talked to the prosecutor and a detective in a confidential interview. Four months later, the district attorney charged Gehrke, Smith and Guffey with one count each of conspiracy to assault and murder, alleging that Gehrke and Smith had personally used a deadly and dangerous weapon in committing the murder and that they suffered various prison, serious felony and strike priors.

At trial, the prosecution introduced evidence of the foregoing, although Phifer's trial testimony varied substantially from his statements to police and his preliminary hearing testimony; he claimed he could not remember much about the circumstances surrounding the murder, other than his conversation with Guffey, or his prior statements because he was using drugs heavily until shortly before the trial. Gehrke presented an alibi defense, introducing evidence suggesting that he and Phifer worked at a house in Cardiff for seven hours on the day of the murder. Guffey also presented alibi evidence and attempted to establish that Phifer had asked Gehrke and Smith to assault or kill Rawson for failing to pay a drug debt. Smith attacked Stark's credibility and argued that he was not involved in the murder, as established by the fact that he and Gehrke did not fit the descriptions given by the Rawsons' neighbor of the two men he saw hanging around the neighborhood with Stark on the day of the murder and Gehrke's alibi evidence.

(Lodgment No. 6, People v. Gehrke, et al., No. D042984, slip op. at 3-9.)

/ / /

/ / /

/ / /

/ / /

# IV.

## PETITIONER'S CLAIMS

(1)  Petitioner's Fourteenth Amendment right to due process was violated because the evidence was insufficient to support a finding that the murder was the natural and probable consequence of simple assault.  (Pet. at 6.)

(2)  Petitioner's Fourteenth Amendment right to due process was violated by the failure to sever his trial from the trial of his co-defendants.  (Pet. at 7.)

(3)  Petitioner's right to confront and cross-examine witnesses under the Sixth and Fourteenth Amendments was violated by the admission of co-defendant Smith's extrajudicial statements.  (Pet. at 8.)

# V.

## DISCUSSION

For the following reasons, the Court finds that Petitioner's claims do not merit habeas relief.  The Court therefore recommends that judgment be entered denying the Petition.

**A.     Standard of Review.**

Title 28, United States Code, § 2254(a), sets forth the following scope of review:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

Under 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (1)-(2) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.  An unreasonable application may also be found, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." Williams, 529 U.S. at 412.

Habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court." 28 U.S.C.A. § 2254(d)(2) (West 2006).  In order to satisfy this provision, Petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming they rest on a factual determination, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B.      Petitioner is not entitled to habeas relief as to claim one.**

Petitioner first claims that there is insufficient evidence to support his conviction for second degree murder because there was insufficient evidence adduced at trial that the murder was a natural and probable consequence of the conspiracy to commit assault.  (Pet. at 6.) Petitioner argues that the evidence at trial merely established that he asked Phifer to scare the

victim or beat him up, that Phifer was aware that Petitioner did not want the victim killed, and that Phifer told Gehrke to scare or beat up the victim, not to kill him.  (Memorandum of Points and Authorities in Support of Petition ["Pet. Mem."] at 5-7.)  This evidence, coupled with Stark's testimony that she was completely surprised by the stabbing and did not see it coming, is, Petitioner argues, insufficient to satisfy the natural and probable consequences doctrine under California law.  (Id.)

Respondent argues that, applying AEDPA deference, the state court's finding that the murder was a natural and probable consequence of conspiracy to commit assault under the facts of this case was neither contrary to nor involved an unreasonable application of clearly established federal law.  (Ans. Mem. at 16-19.)  Respondent contends that the determination of whether a criminal act was the natural and probable consequence of another criminal act is a question of fact for the jury, and, under California law, where the connection between the two offenses is close, as here, the conspirators could avoid liability for murder only where the target offense was trivial.  (Id. at 18.)  The target offense was not trivial, Respondent argues, because it involved aggravated assault, because Petitioner solicited Gehrke to assault the victim knowing that Gehrke had previously stabbed a man during a fight, and because Petitioner had asked Stanley if she knew anyone who would be willing to hit Petitioner with a car.  (Id.)  Petitioner replies that AEDPA deference is not appropriate here because the appellate court failed to directly address his claim, but only dealt with a similar claim by his co-defendants, and that the appellate court's determination is in any case erroneous.  (Traverse at 7-13.)

Petitioner presented claim one to the state supreme court in a petition for review which was denied without comment or citation to authority.  (Lodgment No. 8; Supplemental Lodgment No. 8.)  The Court must "look through" the silent denial of this claim by the state supreme court to the last reasoned state court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991).  The appellate court denied this claim in a reasoned opinion, stating:

> Under the natural and probable consequences doctrine, a conspirator is liable for "the unintended acts by coconspirators if such acts are ... the reasonable and natural consequence of the object of the conspiracy," even if the act was not intended as part of the agreed-upon objective, and even if the conspirator did not know of the act and was not present when it was committed.  (People v. Hardy, supra, 2 Cal.4th at p. 188, fn omitted; also People v. Prettyman (1996) 14 Cal.4th

248, 260.) Here, although there was no evidence that Guffey personally participated in killing Rawson, the prosecution argued to the jury that Guffey was nonetheless liable for the murder because murder was a natural and probable consequence of the conspiracy among Guffey, Gehrke and Smith to assault Rawson. Guffey argues that the trial court erred in denying his motion for acquittal under Penal Code section 1118.1 on the murder count against him because, as a matter of law, murder is not a natural and probable consequence of conspiracy to commit a simple assault; alternatively, he contends the evidence was insufficient to establish that Rawson's murder was a natural and probable consequence of the conspiracy to assault him.

The determination of whether one criminal act was a natural and probable consequence of another criminal act is generally a factual question to be resolved by the jury in light of all the circumstances. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.) The test to be applied is an objective one: "(t)he issue does not turn on the [actor]'s subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the (actor)'s position would have or should have known that the charged offense was a reasonably foreseeable consequence" of the target offense. (*Ibid*.; see also CALJIC No. 6.11 ("what a person of reasonable and ordinary prudence would have expected would be likely to occur," given the circumstances).)

The natural and probable consequences doctrine requires a close connection between the target crime and the offense actually committed and thus a conspirator will not be liable for a coconspirator's commission of a very serious crime, such as murder, where the target offense was "trivial." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 269.) However, although Guffey argues that the target offense of simple assault is trivial as a matter of law, the case law does not support his contention. (See *People v. Montes* (1999) 74 Cal.App.4th 1050, 1054-1056 (in the context of a gang confrontation, a jury may find murder is the natural and probable consequence of "targeted offenses of simple assault and breach of the peace for fighting in public," regardless of whether participants knew weapons were on hand); compare *People v. Hickles* (1997) 56 Cal.App.4th 1183, 1197.) Thus, the question presented is whether the evidence was sufficient to support the jury's finding that murder was a natural and probable consequence of the conspiracy to assault in this case. Under the circumstances, we conclude that it was.

The evidence at trial was sufficient to permit an inference that Guffey asked Gehrke, who was later joined by Smith, to hurt, or even kill, Rawson. Prior to the murder, Guffey made repeated threats that he would kill Rawson and he solicited Phifer to at least beat Rawson up. After Phifer turned him down, Guffey approached Gehrke, who he knew had been involved in the scuffle with Guest that ended in Guest being stabbed, to do the job. Guffey also asked Amber Stanley if she knew anyone who would be willing to hit Rawson with a car. Shortly before the murder, Guffey drove by the Rawsons' house, while Gehrke and Smith were inside, and the evidence suggests that Gehrke called Guffey's cell phone from the house. After the murder, Gehrke called Guffey from Bunch's house and Guffey thereafter bragged to Amber Stanley that he had "got (Rawson) good."

Guffey nonetheless contends that the murder was not a natural and probable consequence of the conspiracy because there was no evidence that he knew Gehrke and Smith were armed or that they were likely to use weapons or force against Rawson. However, it is not necessary that the defendant knew his coconspirators were armed for him to be liable for a homicide arising out of a

1    conspiracy to assault.   (*People v. Montes*, *supra*, 74 Cal.App.4th at p. 1056;
2    *People v. Godinez* (1992) 2 Cal.App.4th 492, 501, fn. 5.)

3         Because there was sufficient evidence to support a finding that Rawson's
     murder was a natural and probable consequence of the conspiracy to assault
     Rawson, the trial court did not err in denying Guffey's trial motion for acquittal
4    of the murder charge under section 1118.1. Similarly, the court did not err in
     denying Guffey's posttrial motion for a new trial after finding that there was
5    insufficient evidence to establish that the object of the conspiracy was to commit
     murder.

6

7    (Lodgment No. 6, People v. Gehrke, et al., D042984, slip op. at 44-47.)

8         Because the claim was adjudicated on its merits in the state courts, habeas relief is only

9    available if that adjudication was contrary to, or involved an unreasonable application of, clearly

10   established federal law, or was based on an unreasonable determination of the facts in light of

11   the evidence presented at trial. Williams, 529 U.S. at 405-07; Miller-El, 537 U.S. at 340. The

12   clearly established federal law regarding sufficiency of the evidence claims in the criminal

13   context is set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). In Jackson, the Court held

14   that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled

15   to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no

16   rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443

17   U.S. at 324. In making this determination, habeas courts must respect the province of the jury

18   to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable

19   inferences from proven facts by assuming the jury resolved all conflicts in a manner that

20   supports the verdict. Id. at 319. Once a state court fact finder has found a defendant guilty,

21   federal habeas courts must consider the evidence "in the light most favorable to the prosecution."

22   Id. Federal habeas courts must also analyze Jackson claims "with explicit reference to the

23   substantive elements of the criminal offense as defined by state law." Id. at 324 n.16.

24        The Ninth Circuit has stated that: "After AEDPA, we apply the standards of Jackson with

25   an additional layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1275 (9th Cir. 2005). In

26   Allen, the Ninth Circuit first reviewed the standard of review applied by the state appellate court

27   to a sufficiency of the evidence claim, and found that although the state court did not cite to the

28   relevant federal case law, "such a citation is not required 'so long as neither the reasoning nor

the result of the state-court decision contradicts' Supreme Court precedent."  Id. at 1274 n.12, quoting Early v. Packer, 537 U.S. 3, 8 (2002).

The state court correctly found that sufficient evidence exists to support a finding that the victim's murder was a natural and probable consequence of the conspiracy engineered by Petitioner to assault the victim.  The state law requirements for determining whether the murder was a natural and probable consequence of the target crime is, as the appellate court noted, an objective test which "depends upon whether, under all of the circumstances presented, a reasonable person in [Petitioner]'s position would have or should have known that the charged offense was a reasonably foreseeable consequence of the target offense." (Lodgment No. 6, People v. Gehrke, et al., D042984, slip op. at 45.)  The jury was presented with evidence from which they could reasonably conclude that the death of the victim was a foreseeable consequence of the attack Petitioner commissioned on the victim.  Kathleen Dockler, Petitioner's ex-girlfriend, began a romantic relationship with the victim while still living with Petitioner, and testified that after Petitioner found out about the relationship he twice threatened to kill the victim, and that the victim was killed several days after he made the threats.  (Lodgment No. 1, Reporter's Tr. ["RT"] at 169-84.)  Although Petitioner contends that he only asked Phifer to scare or beat up the victim, the jury was presented with evidence that after Phifer indicated that he was not interested in getting involved in a domestic situation, Gehrke immediately indicated that he was interested, and the victim was killed two days after Phifer gave Gehrke Petitioner's telephone number and told Gehrke to give Petitioner a call.  (RT 531-37.)  After the murder, Gehrke told Phifer that they had done what Petitioner had wanted them to do, which was to stab the victim.  (RT 537-38.)  This evidence, coupled with the state court's finding that Petitioner solicited Gehrke to join the conspiracy knowing that Gehrke had previously been involved in a scuffle in which someone was stabbed, provides sufficient evidence for the jury to find that Petitioner commissioned Gehrke to assault and possibly stab the victim, and that murder was a natural and probable consequence of the target crime.  Petitioner was also linked to the conspiracy by evidence that he was seen in the victim's neighborhood around the time of the killing, that he  received a telephone call at or around the time of the killing, and that he was

aware that Gehrke, Smith and Stark were inside the victim's house about to attack the victim. It was objectively reasonable for the state court to find that a reasonable person in Petitioner's position knew or should have known that the victim may have been killed as a result of the type of target crime perpetrated here.

Analyzing Petitioner's sufficiency of the evidence claim "with explicit reference to the substantive elements of the criminal offense as defined by state law" as the Court must, Jackson, 443 U.S. at 324 n.16, the Court finds that sufficient evidence exists in the record to support the jury's finding that second degree murder was a natural and probable consequence of conspiracy to assault the victim. The appellate court's determination to that extent is objectively reasonable, and the adjudication of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state courts. Accordingly, the Court recommends denying habeas relief as to claim one.

**C.    Petitioner is not entitled to habeas relief as to claim two.**

Petitioner contends in claim two that his Fourteenth Amendment right to due process was violated by the failure to sever his trial from the trial of his co-defendants. (Pet. at 7.) Specifically, he argues that his defense was mutually antagonistic with the defense of his co-defendants, and that his decision to testify in his own behalf was circumscribed because the transcript of a "free talk" he had with the prosecutor prior to being charged would have been disclosed to his co-defendants if he testified. (Pet. Mem. at 10-18.)

Respondent argues that the trial court properly denied Petitioner's severance motion and the state appellate court's adjudication of this claim was neither contrary to nor involved an unreasonable application of clearly established law. (Ans. Mem. at 19-23.)

The Court will look through the silent denial of this claim by the state supreme court to the appellate court opinion, which stated:

> When multiple defendants are jointly charged with a particular offense, they must be tried jointly unless the court, in its discretion, orders otherwise. (Pen.Code, § 1098; *People v. Alvarez* (1996) 14 Cal.4th 155, 190; see also *Zafiro v. United States* (1993) 506 U.S. 534, 537 (recognizing that joint trials promote economy and efficiency).) On appeal, we review the trial court's decision for an

abuse of discretion, based on the facts as they appeared at the time of the hearing on the motion.  (*People v. Pinholster* (1992) 1 Cal.4th 865, 932.)  Though severance is left to the sound discretion of the trial court, severance should generally be granted where (a) a codefendant has made an incriminating confession, (b) the association with the codefendants is prejudicial, (c) the presentation of evidence on multiple counts is likely to create confusion, or (d) there is a possibility that at a separate trial, a codefendant would give exonerating testimony.  (*Ibid.*)

Where, as here, the motion for a separate trial is made after the trial has commenced, the defendant cannot raise any appellate objection to its denial unless the joint trial created "a gross unfairness" that deprived him of a fair trial or due process.  (*People v. Burns* (1969) 270 Cal.App.2d 238, 251-252; see also *People v. Pinholster*, *supra*, 1 Cal.4th at p. 933.)  Guffey contends that such unfairness resulted here because (A) if he had been tried separately, he would have been able to take the stand without having to disclose to counsel for Gehrke and Smith the transcript of his free-talk interview; and (B) his defense was mutually antagonistic with those of Gehrke and Smith.  Gehrke and Smith join in Guffey's argument, but do not make any independent argument that their constitutional rights were likewise violated.

A. The Free-Talk Interview

Guffey contends that because he was denied a separate trial, he could not testify without having to disclose the free-talk interview to Gehrke and Smith and that this interfered with his right to testify at trial.  However, it was not the joint trial, but instead the interview, that created the situation of which Guffey now complains.  Guffey could not, by making the decision to engage in a free-talk interview with police, thereby require the trial court to give him a separate trial that, by statute, is disfavored in a case such as this one.  For these reasons, we conclude that the fact of the joint trial did not violate Guffey's rights to due process or a fair trial.

B. Antagonistic Defenses

The law is clear that the joint trial of defendants who have conflicting or antagonistic defenses does not necessarily violate a defendant's due process or fair trial rights.  (*People v. Morganti* (1996) 43 Cal.App.4th 643, 672-675, and cases cited therein; see *People v. Hardy* (1992) 2 Cal.4th 86, 168.)  As the California Supreme Court has recognized "[n]either antagonistic defenses nor the fact that ... one defendant incriminates the other amounts, by itself, to unfair prejudice.... That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than *against* a joint trial.  If one is lying, it is easier for the truth to be determined if all are required to be tried together."  (*People v. Hardy*, *supra*, 2 Cal.4th at p. 169, fn. 19, quoting *Ware v. Commonwealth* (Ky.1976) 537 S.W.2d 174, 177.)  Thus, a defendant who challenges a joint trial on the basis of antagonistic defenses must establish that the defenses were so irreconcilable that "the acceptance of one party's (theory of) defense (would) preclude the acquittal of the other." (*People v. Hardy*, *supra*, 2 Cal.4th at p. 168, quoting *United States v. Ziperstein* (7th Cir.1979) 601 F.2d 281, 285.)  Such a challenge has rarely, if ever, resulted in the reversal of a conviction. (See *People v. Hardy*, *supra*, 2 Cal.4th at p. 168.)  Guffey's challenge similarly fails.

1
2
3
4
5

Here, each of the defendants denied their individual culpability and attacked the credibility of the prosecution's witnesses.  Gehrke and Guffey presented evidence that each of them was somewhere other than the Rawsons' house at the time of the murder.  Smith argued that the neighbor's description of the three people who were in the vicinity of the Rawsons' house on the morning of the murder and Gehrke's alibi evidence established that two other men accompanied Stark to the Rawsons' home and committed the murder.  These, the defendants' primary theories of defense at trial, were not at all conflicting or antagonistic.

6
7
8
9

In addition to presenting an alibi defense on behalf of his client, Guffey's counsel attempted to elicit evidence, and argued, that Phifer had sent Gehrke and Smith to assault or kill Rawson for failing to pay a drug debt.  Further, Gehrke's counsel argued that the nature of Rawson's wounds suggested the crime was one of passion, implying that Guffey was the killer.  Smith also introduced evidence in an attempt to suggest that Guffey might have committed the murder.

10
11
12
13
14
15

Although these theories were antagonistic to Guffy's defense, they were largely based on evidence presented by the prosecution as part of its case in chief and raised by argument.  To the extent that Guffey's codefendants elicited evidence suggesting Guffey's direct involvement in the murder, Guffey does not explain why this evidence would not have been admissible in a separate trial against him if the prosecution had decided to pursue a similar theory.  Under these circumstances, the fact that the defendants were tried jointly did not violate Guffey's rights to due process or a fair trial.  (*People v. Keenan* (1988) 46 Cal.3d 478, 500; *People v. Morganti*, *supra*, 43 Cal.App.4th at p. 675; see also *People v. Pinholster*, *supra*, 1 Cal.4th at p. 933 ("a defendant's natural tendency to shift blame onto a codefendant is not in itself a sufficient ground for severance.").)

16   (Lodgment No. 6, <u>People v. Gehrke, et al.</u>, D042984, slip op. at 41-44.)

17   Petitioner argues that his federal due process rights were violated by the failure to sever

18   his trial, citing <u>Zaffro v. United States</u>, 506 U.S. 534, 539 (1993), and because his right to testify

19   in his own behalf was circumscribed by the holding of the trial judge that the transcript of the

20   free talk would be turned over to the other defendants if he testified, citing <u>Rock v. Arkansas</u>,

21   483 U.S. 44, 51 (1987).  The Court will address these two issues separately.

22   **a)  Failure to sever trial**

23   The United States Supreme Court has observed that there is a heightened risk of prejudice

24   where defendants "are tried together in a complex case and they have markedly different degrees

25   of culpability." <u>Zaffro v. United States</u>, 506 U.S. 534, 539 (1993).  The <u>Zaffro</u> Court was careful

26   to note that such prejudice flows from the intrusion joint trials may have on the accused's

27   established federal Constitutional rights, such as introduction of evidence which is technically

28   admissible against only one co-defendant, or the unavailability of exculpatory evidence that

1   would otherwise be available if the defendant were tried alone.  Id., citing Bruton v. United

2   States, 391 U.S. 123 (1968), and Kotteakos v. United States, 328 U.S. 750 (1946).

3        As the appellate court correctly observed, the majority of the defenses presented by the

4   various defendants at Petitioner's trial were not antagonistic.   The two defendants who

5   committed the assault and murder took the position that they did not commit the crimes.

6   Because Petitioner was accused of soliciting those two defendants, his own defense was

7   bolstered by the innocence defense of his co-defendants.  Petitioner presented the additional

8   defense that someone other than himself had solicited the assault on the victim.  The appellate

9   court recognized that there was a certain aspect of the defenses which were antagonistic to

10  Petitioner.  This included the fact that Gehrke argued that the nature of the wounds suggested

11  a crime of passion, thereby implicating Petitioner due to the evidence that he was upset when

12  he found out about the relationship between the victim and his ex-girlfriend.  In addition, Smith

13  attacked Stark's credibility and argued that he did not fit the description of the men seen in the

14  neighborhood.  However, the appellate court also correctly found that Petitioner had failed to

15  establish that such evidence would have been inadmissible had he been tried separately.  Because

16  Petitioner has not established the violation of any federal Constitutional right flowing from the

17  failure to sever the trials, he has failed to demonstrate that the state court's adjudication of this

18  claim was contrary to, or involved an unreasonable application of, clearly established federal

19  law.  Zaffro, 506 U.S. at 539; Williams, 529 U.S. at 405-07.

20        **b)    Right to testify**

21        Petitioner contends that the decision whether to testify at trial was circumscribed by the

22  ruling of the trial judge that if he were to testify the transcript of his free talk would be provided

23  to his co-defendants.  As set forth above, the appellate court denied this claim, stating:

24        However, it was not the joint trial, but instead the interview, that created the
         situation of which Guffey now complains.  Guffey could not, by making the
25        decision to engage in a free-talk interview with police, thereby require the trial
         court to give him a separate trial that, by statute, is disfavored in a case such as
26        this one.  For these reasons, we conclude that the fact of the joint trial did not
         violate Guffey's rights to due process or a fair trial.

27

28  (Lodgment No. 6, People v. Gehrke, et al., D042984, slip op. at 42.)

07cv1620

1   The agreement reached between Petitioner, his counsel and the deputy District Attorney
2   stated that the government as well as the other defendants could use any inconsistent statements
3   made during the free talk to impeach Petitioner if he testified. (Lodgment No. 1, Reporter's Tr.
4   ["RT"] at 1587-88.) Petitioner's counsel argued extensively at trial that the free talk should not
5   be turned over to the other defendants if Petitioner testified.  Counsel argued there was
6   information in the free talk which had not yet come out at trial which was damaging to
7   Petitioner, including information about events of which the other defendants were not aware, and
8   such information would not constitute impeachment because Petitioner would not testify as to
9   those events.  (RT 1589-90.)  Petitioner has identified no clearly established federal law
10  protecting him from being cross-examined with prior inconsistent out-of-court statements which
11  were freely given, such as the free talk here, or in protecting such statements from discovery.
12  In fact, both the trial and appellate courts found that the free talk contained no material required
13  to be turned over to the defense under Brady v. Maryland, 373 U.S. 83 (1963), or any
14  information which would have assisted the other defendants in defending the charges against
15  them.  (Lodgment No. 6, People v. Gehrke, et al., D042984, slip op. at 19-20.)  Petitioner has
16  not attempted to challenge those findings, which are entitled to a presumption of correctness in
17  this Court.  See Sumner v. Mata, 449 U.S. 539, 545-47 (1981) (stating that deference is owed
18  to factual findings of both state trial and appellate courts).

19  The appellate court's adjudication of claim two was neither contrary to, nor involved an
20  unreasonable application of, clearly established federal law, and was not based on an
21  unreasonable determination of the facts.  Accordingly, the Court recommends denying habeas
22  relief with respect to claim two.

23  **D.    Petitioner is not entitled to habeas relief as to claim three.**

24  Petitioner contends in claim three that the admission of out-of-court statements by co-
25  defendant Smith to prosecution witness Phifer violated his right to confront and cross-examine
26  witnesses.  (Pet. at 5.)  Specifically, Petitioner contended in the state appellate and supreme
27  courts that the admission of Phifer's testimony that after the killing, co-defendant Smith said "we
28  offed him man," indicating they killed the victim, which incriminated Petitioner by implication

through the use of the pronoun "we," and "I sent it on home with the old, the old timer," referring to a knife Smith had which he called the old timer, indicating Smith stabbed the victim, constituted <u>Bruton/Aranda</u>[1] error.  (Lodgment No. 8 at 28; Lodgment No. 7 at 16-18; Lodgment No. 3 at 18-25.)

Respondent contends that the adjudication of this claim by the state court was consistent with federal law and was a proper application of the rule in <u>Bruton</u> because Petitioner was not present when Smith made the statements and no reasonable jury would think that Smith was referring to Petitioner.  (Ans. Mem. at 23-25.)

The Court will look through the silent denial of this claim by the state supreme court to the appellate court opinion.  The appellate court stated:

Prior to trial, Gehrke moved to sever his trial from those of his codefendants or to exclude Smith's statements to Phifer implicating him in Rawson's murder, arguing that the admission of those statements would violate his constitutional rights of confrontation and cross-examination.  Satisfied that the statement could be admitted as an adoptive admission, the court denied the motion to sever and allowed the statements to be introduced at trial.  Gehrke argues that the court erred in so doing, an argument in which Guffey joins.

Pursuant to the adoptive admissions exception to the hearsay rule, "[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the constitutional right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt."  (*People v. Fauber* (1992) 2 Cal.4th 792, 852, quoting *People v. Preston* (1973) 9 Cal.3d 308, 314.)  The theory underlying this exception is that "the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial" (*People v. Simmons* (1946) 28 Cal.2d 699, 712) and if the accused fails to act as an innocent person would be expected to in the face of an accusation, an inference of consciousness of guilt may properly be drawn therefrom.  (*People v. Green* (1952) 111 Cal.App.2d 794, 798.)

There are two requirements to satisfy the hearsay exception for adoptive admissions: the party must (1) have had knowledge of the content of the declarant's statement, and (2) with such knowledge, have used words or conduct

---

[1]  <u>See Bruton v. United States</u>, 391 U.S. 123, 135 (1968) (holding that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions [to assess the impact of a statement of a co-defendant as to that defendant only and not any other co-defendants] is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.") and <u>People v. Aranda</u>, 63 Cal.2d 518 (1965) (finding that admission of confession implicating co-defendant in joint trial resulted in miscarriage of justice notwithstanding jury instruction that the confession was admissible only against confessing defendant).

07cv1620

indicating his adoption of, or his belief in, the truth of such hearsay statement. (*People. v. Combs, supra*, 34 Cal.4th at p. 843, italics omitted; Evid.Code, §1221.) The trial court may admit the proffered evidence of an adoptive admission if the evidence supports a reasonable inference that these preliminary facts exist and then the jury must determine whether an adoptive admission was actually made. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011.)

Gehrke argues that the adoptive admissions exception to the hearsay rule does not apply here because there was no evidence establishing either that he was present at the time Smith admitted having killed Rawson or that he heard Smith make that statement.  However, in his police interview, Phifer indicated that Gehrke and Smith came to his motel room together and that after Gehrke told him they needed to get out of town, Smith blurted out that they had "offed" Rawson. This evidence was sufficient to support an inference that Gehrke was present and able to hear Smith's statements and thus was sufficient to support the trial court's determination to submit the issue to the jury.

Gehrke also contends that Smith's statements did not constitute adoptive admissions by him because Smith's use of the word "we" was ambiguous and might not have referred to him, in which case he would have had no reason to object or to deny any involvement in the murder.  Smith's choice of terminology, however, goes to the weight rather than the admissibility of his statements.  In light of the evidence that Gehrke and Smith arrived at Phifer's motel room together and were the only people talking to Phifer when Smith made the statements and that Gehrke commented repeatedly that they "gotta git," the jury could reasonably conclude that Smith's use of the word "we" referred to Smith and Gehrke.

Finally, Gehrke contends that Phifer was unreliable as a witness and thus Phifer's statements could not support the trial court's decision to submit the proffered evidence of the adoptive admission for the jury's consideration. Notably, Gehrke cites no authority in support of this argument, which is unpersuasive in any event.  "[T]he evidence as to the existence of the preliminary facts for admissibility of a declarant's hearsay statement against a party as the party's adoptive admission need not convince the trial judge, by a preponderance of the evidence, that such preliminary facts exist.  The trial judge needs [only] to be convinced . . . that the evidence is sufficient for a reasonable trier of fact to find that the preliminary facts exist. . . ." (*People v. Pic'l* (1981) 114 Cal.App.3d 824, 860, disapproved on other grounds in *People v. Kimble* (1988) 44 Cal.3d 480, 498.)  The trial court properly concluded that the evidence was sufficient to support the jury in finding that the requisite preliminary facts existed and that the jury could properly assess Phifer's credibility in determining whether Smith's statements to Phifer constituted adoptive admissions by Gehrke.

(Lodgment No. 6, <u>People v. Gehrke, et al.</u>, D042984, slip op. at 10-15.)

"The Sixth Amendment's Confrontation Clause provides that, '(i)n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'  We have held that this bedrock procedural guarantee applies to both federal and state prosecutions." <u>Crawford v. Washington</u>, 541 U.S. 36, 42 (2004) (citing <u>Pointer v. Texas</u>, 380 U.S. 400, 406 (1965)).  The confrontation clause "guarantees the defendant a face-to-face

07cv1620

1    meeting with witnesses appearing before the trier of fact." Coy v. Iowa, 487 U.S. 1012, 1016

2    (1988).  The physical confrontation "enhances the accuracy of factfinding by reducing the risk

3    that a witness will wrongfully implicate an innocent person." Maryland v. Craig, 497 U.S. 836,

4    846 (1990).  The introduction of prior testimonial statements of a witness violates a defendant's

5    confrontation rights unless the person who made the statements is unavailable to testify and there

6    was a prior opportunity for cross-examination.  Crawford, 541 U.S. at 68.

7         The Supreme Court in Bruton specifically left open the issue regarding whether the

8    Confrontation Clause would be offended by the admission of a co-defendant's statement which

9    satisfied an exception to the hearsay rule, such as the adoptive admission exception relied upon

10   by the appellate court here.  Bruton, 391 U.S. at 128 n.3 (stating that: "we intimate no view

11   whatsoever that such exceptions necessarily raise questions under the Confrontation Clause.")

12   The appellate court here recognized (see Lodgment No. 6, People v. Gehrke, et al., No D042984

13   slip op. at 11), that the Supreme Court revisited the issue it had left open in Bruton in White v.

14   Illinois, 502 U.S. 346 (1992), where it held that admission of statements by a four-year old girl

15   to her babysitter, her mother, a police officer, an emergency room nurse and a doctor, each of

16   which satisfy the "spontaneous exclamation" and "statements made for medical treatment'

17   exceptions to the hearsay rule, did not violate the Confrontation Clause even though the

18   declarant did not testify at trial and was not "unavailable," because the statements were

19   necessarily made under conditions "that provide substantial guarantees of their trustworthiness."

20   Id. at 355-56.

21        The Supreme Court has since abrogated that approach, at least with respect to

22   "testimonial" statements, holding in Crawford that recorded testimonial statements cannot be

23   admitted at trial unless the declarant is unavailable to testify and the defendant had a prior

24   opportunity to cross-examine the declarant about the statement.  Crawford, 541 U.S. at 59.

25   Although Crawford stated that it "need not definitively resolve whether [White] survives

26   [Crawford]," it is clear that, to the extent White survives, it should be limited to situations where

27   the statements were non-testimonial.  Crawford, 541 U.S. 61.  The Ninth Circuit has held, pre-

28   Crawford, that the adoptive admission exception to the hearsay rule does not "automatically

satisfy the Confrontation Clause, at least where the third-party statements alleged to have been adopted have probative value independent of the fact they may have been adopted by the defendant." United States v. Monks, 774 F.2d 945, 952 (9th Cir. 1985).

The appellate court's finding that the introduction of Smith's admission did not violate the Confrontation Clause because it was an adopted admission was neither contrary to nor involved an unreasonable application of Bruton, because Bruton specifically declined to address that issue. The appellate court's decision did not involve an unreasonable application of Crawford because Smith's statement was non-testimonial, and Crawford does not recognize non-testimonial statements as implicating the Confrontation Clause. Crawford, 541 U.S. at 68. To the extent White survived Crawford, the appellate court's finding was neither contrary to nor involved an unreasonable application of White because the statement fell within a firmly established hearsay exception and was made under conditions which render it reliable.

However, even to the extent that Petitioner could demonstrate that a Confrontation Clause violation occurred, or that the state court adjudication of his claim was objectively unreasonable, he must also demonstrate that the error was not harmless in order to be entitled to federal habeas relief. "Confrontation Clause violations are subject to harmless error analysis, because 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004), quoting Delaware v. Van Arsdall, 475 U.S. 673, 680-81 (1986)). "Evidence erroneously admitted in violation of the Confrontation Clause must be shown harmless beyond a reasonable doubt, with courts considering the importance of the evidence, whether the evidence was cumulative, the presence of corroborating evidence, and the overall strength of the prosecution's case." Id., quoting United States v. Bowman, 215 F.3d 951, 961 (9th Cir. 2000). Habeas relief in this Court is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or unless the judge 'is in grave doubt' about the harmlessness of the error." Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004), quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) and O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "The relevant inquiry is whether the [error] actually harmed the appellant." Medina, 386 F.3d at 877; see also Fry v. Pliler, 552 U.S. ___, 127 S.Ct.

2321, 2327 (2007) (holding that harmless error analysis is still required after a showing that the state court opinion was contrary or involved an unreasonable application of clearly established federal law because 2254(d) "sets forth a precondition to the grant of habeas relief . . ., not an entitlement to it.")

Smith's statements were cumulative to other evidence that Smith and Gehrke killed the victim, including the fact that a neighbor of the victim saw two men and a woman who looked out of place walking in the neighborhood shortly before the murder.  Most notably, Stark was present during the killing and testified as to the actions of Gehrke and Smith.  There was also evidence that Gehrke and Smith showed up unexpectedly at a friend's house shortly after the murder where they requested permission to clean up, and thereafter called Petitioner.

In determining whether the Confrontation Clause error in admitting Smith statements was harmless, the Court must consider "the importance of the evidence, whether the evidence was cumulative, the presence of corroborating evidence, and the overall strength of the prosecution's case." Nielsen, 371 F.3d at 581.  Respondent contends that Smith's admission was not important evidence against Petitioner because Petitioner was not present when Smith made the remarks and it would have been impossible for a jury to think that Smith was talking about Petitioner when he made the statements.  (Ans. Mem. at 24.)  Smith's statement merely supported a finding that Smith and Gehrke killed the victim, and as such implicated Petitioner only in the sense that Petitioner was accused of hiring Gehrke to attack the victim.  Smith's statement was cumulative to Stark's testimony and other evidence that Smith and Gehrke killed the victim, and Petitioner's guilt was corroborated not only by Stark's testimony but by the evidence regarding his actions before and after the killing.  The alleged error therefore did not have a "substantial and injurious effect or influence in determining the jury's verdict," and the Court "is 'not in grave doubt' about the harmlessness of the error." Medina, 386 F.3d at 877.

The appellate court's adjudication of claim three was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  Even assuming a Confrontation Clause violation occurred with respect to either statement, and/or that the appellate court opinion was contrary to or involved an unreasonable application of clearly established federal law, any

error was harmless.  Accordingly, the Court recommends denying habeas relief with respect to claim three.

**VI.**

**CONCLUSION AND RECOMMENDATION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **September 28, 2009** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **ten days after being served with the objections**. The parties  are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  August 28, 2009

_____

**CATHY ANN BENCIVENGO**
United States Magistrate Judge

07cv1620